IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 3:09-cr-69 |
| ) | |
| Derle O. Marchus, and ) | **ORDER GRANTING RULE 29 MOTION FOR** |
| ) | **DIRECTED VERDICT OF ACQUITTAL** |
| Jesse Neil Marchus, ) | |
| ) | |
| Defendants. ) | |

_____

The defendants were charged with conspiracy to commit money laundering. The scheme was allegedly designed to hide, conceal, etc. the proceeds of drug dealing engaged in by one Donovan Slagg.

Mr. Slagg was arrested on a meth possession and distribution charge in Burleigh County, North Dakota. He was charged under State law and a State District Court Judge set his bail at $50,000 (cash only).

Tamara Heid is Mr. Slagg's mother. He immediately contacted her from the jail,(on a line which is recorded for all inmate calls with the exception of calls to lawyers) and begged her to get him out of the jail. In a series of calls, Tamara Heid was directed to various individuals who either owed Mr. Slagg money or who might be willing to either contribute or loan money towards the cash bond fund. The calls contain a number of statements by Ms. Heid that she was not capable of raising that sum of money on her own or with assets available to her.

The funds were collected, and a decision made to contact a local bail bondsman, Derle Marchus, to hire him to accomplish Mr. Slagg's release using the $50,000 in cash, in exchange

1

for a $1,000 fee. Ms. Heid contacted Derle Marchus by telephone on January 20, 2009, to make the arrangements. Derle testified that he writes 90% of the bonds in Burleigh County. Consequently, he is well known local bondsman.

On January 21, 2009, Derle and his son Jesse met Ms. Heid and her mother at what he believed to be the grandmother's apartment, where piles of cash were spread on every available surface. The funds were counted, supposedly to the total of $50,000, and an additional $1,000 given to Derle Marchus as the agreed upon fee for accomplishing the release of Mr. Slagg. Derle was armed and the funds were packed into a small duffel bag.

Derle and Jesse proceeded to the Burleigh County Courthouse (weapon checked at the door with the court security officers) and delivered the cash to the office of the clerk of District Court. The cash was unpacked and 2 clerk's office employees began counting it. This count showed the total to be only $48,000. Ms. Heid was contacted and joined Derle and Jesse in a clerk's office conference room, where the funds were again counted and somehow, the proper total reached.

Two documents were prepared. The first was the "bond jacket or envelope" which was completed by Derle Marchus. This showed that the cash bond was being posted by Marchus's bonding company for the release of Donovan Slagg, and the security, the $50,000 in cash was to be transferred back to Ms. Heid if the bond was exonerated. The second document was prepared by the clerk's office, and was the treasury department form 8300 required when cash transactions of $10,000 or more are entered into.

When deputy clerk Peggy Walker asked whose name should appear as providing the money, neither Heid (who had in fact provided the money) or Derle (who had already disclaimed

any ownership interest in the money in the assignment back of the proceeds on the bail jacket) wanted their names listed.  All appeared to be operating on the assumption that having their name on the form converted the proceeds into reportable income.  Jesse, indicating his only reachable assets were some music videos, told the clerks office to insert his name and taxpayer identification number as the person acting as the agent for Donovan Slagg.

Ms. Heid walked down the hall to the sheriff's office and jail and acquired her son.

Federal authorities then indicted Mr. Slagg and a group of other individuals, and the North Dakota State charge was dismissed, but before the dismissal was filed, the Federal Government seized the $50,000 from the clerk's office account in the US Bank.

When forfeiture proceedings were started, Ms. Heid filed a claim asserting, under oath, that the funds were the life savings or her and her mother.

The three individuals charged only with money laundering were severed for trial purposes from the drug defendants.  Several drug defendants pleaded guilty and others, including Mr. Slagg were convicted.

Ms. Heid, one of the three solely indicted on the money laundering count, entered a plea of guilty on the Friday before trial.  In the change of plea hearing she indicated that she was suffering from a brain tumor, was taking pain medication but understood what was happening.  She indicated that she "just wanted to get this over with" and that it was a shame that while her son Donovan was 32 years old, she still had to keep track of all his transactions, prepare the bank deposits and allocate pocket cash to him.  It appeared she was referring to his drug dealings.  When asked what her intent was in gathering the cash and hiring Mr. Marchus, she replied "to get my son out of jail."

After review of the transcripts of the testimony presented at the earlier trial, the parties stipulated that at least a portion of the $50,000 had to have come from the drug dealings, and therefor no further proof was required as to that element.

Prior to trial, the government had provided a witness list showing 41 potential witnesses. After the stipulation regarding drug proceeds, the government called only three witnesses. The first, Amanda Harper, (who had pled guilty to the original dealing and laundering charge) described telephone conversations from Slagg directing her to individuals who were likely donors to the bail bond fund, and at times she was in the company of Ms. Heid when the calls were made. Ms. Harper testified the purpose of gathering the bond money was to get Slagg out of jail.

The second government witness was DEA Special Agent Laurie, who provided the foundation for the recordings of various telephone calls and the attempted transcripts of those calls. Again the calls show Slagg pleading for his release and suggesting sources of funds to put together the $50,000 needed for the cash bond.

The third government witness was the Deputy Clerk of the Criminal Division of the District Court Clerk's office in Bismarck, North Dakota. She described the forms which were completed and the conversations about potential tax liability from one's name appearing on the Treasury Department reporting form. According to her testimony, Derle completed the "bond jacket" containing the assignment back of the funds to Ms. Heid, which would occur when the bond was exonerated. Jesse allowed his name and tax payer ID to be put on the Treasury Department form, and the Sheriff's office was notified that the required $50,000 cash bond for the release of Donovan Slagg had been duly posted and he could be released. Mother Heid then

left to acquire him and the Marchuses left the Courthouse, their day's work done.

The issues of guilt or innocence were submitted to the jury. The jury returned verdicts of guilty as to both defendants. I do not believe that the evidence even viewed in the light most favorable to the guilty verdicts is sufficient.

Elements of the charged offense:

1. Two or more persons agreed to commit money laundering by conducting a financial transaction effecting interstate commerce involving the proceeds of unlawful activity, knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of those proceeds.

2. Voluntarily and intentionally joining in the agreement

3. Knowing the purpose of the agreement.

The Government's theory appears to be that as a matter of law the delivery of $50,000 in cash as a release bond for an arrested individual (presumed innocent of course) is a financial transaction designed to "conceal and disguise the nature, location, source, ownership and control of proceeds of illegal activity."

It therefor follows logically, that anyone who agrees to deliver the money to the clerk's office, knowing that it is to be used as a cash bond, has entered into a conspiracy to launder money. The other apparent matter of law or inescapable conclusion in the Government's analysis is that no one with a modicum of intelligence could fail to recognize that a pile of cash produced to bail out an individual charged with drug dealing had to be dirty money.

I disagree with the basic premise of the government. Money laundering requires particularized proof of A design to conceal and the money laundering statutes cannot be so

broadly construed that they become "money spending statutes." United States v. Shoff, 151 F.3d 889, 892 (8th Cir. 1998) (rejecting the notion that all schemes to defraud people of money necessarily include an element of money laundering); see also, United States v. Shepard, 396 F.3d 1116, 1120 (10th Cir. 2005) (construing money laundering statute as a concealment statute and not a spending statute); United States v. Sanders, 928 F.2d 940, 946 (10th Cir. 1991) (reversing drug dealer's money laundering conviction based on the purchase of two automobiles). The factual underpinnings of this case are far removed from what one would consider traditional money laundering cases which usually involve repeated transfers between bank accounts or the commingling illegal business proceeds with legitimate business proceeds. Schoff 151 F.3d at 891-92. Another common money laundering scheme is the transfer of unlawful proceeds into an account in another person's name or the purchase of goods in another person's name. Id. at 892.

Bondsmen, not unlike criminal defense attorneys, do business with some of the less savory elements of society. Providing a service, whether it be posting a bond, providing security, acting as a courier, or filing a brief, for the benefit of persons charged with a crime or the family of those charged is not itself a criminal act.

No evidence was offered that either Marchus knew that the money was dirty. The $50,000 cash belonged to Slagg or to individuals who may well look to Slagg for repayment. No evidence was offered to show the Marchuses knew this. Ms. Heid collected the money on her son's behalf. No evidence was offered to show the Marchuses knew this. Ms. Heid told the Marchuses the money was her and her mother's life savings. No evidence or testimony was introduced to contradict this. The Marchuses were not parties to any of the jailhouse telephone

calls. There is no evidence either of the Marchuses ever spoke with Slagg. The only evidence of the conversations between Derle and Ms. Heid came from the testimony of Derle. Derle testified that he was told the money was life savings of Ms. Heid and her mother. Ms. Heid submitted an affidavit so stating after the funds were seized. In my opinion the evidence was not sufficient on the issue of knowledge to allow submission to a jury.

As far as the Marchus defendants were concerned, the money came from Heid and it would go back to Heid after the bond was exonerated. No concealment was afforded to Heid as the source of the funds because of the transaction in the clerk's office. "A money laundering violation requires proof of concealment, not the absence of full disclosure." Schoff, 151 F.3d at 891. Substantial evidence of concealment is necessary for conviction and merely suspicious actions do not provide substantial evidence of a design to conceal. Shepard, 396 F.3d at 1121. Concealment means not telling the victim what is really going on. Schoff. 151 F.3d at 891. The bond envelope clearly identifies Ms. Heid as the person to whom the money should be if the bond is exonerated. Just as the car purchases in Schoff were not designed to conceal some relevant aspect of the use of the fraud proceeds, the posting of a cash bond in this case was not designed to conceal the source of the money used. The posting of the cash bond was simply designed to get Slagg out of jail. If Slagg and his mother had additional motives there is no evidence the Marchuses were aware of them.

Ms. Heid and her mother did not testify. Derle testified he was hired to carry the money to the courthouse. Derle brought Jesse along for additional security. The Government argued there must have been a conspiracy because the fee was too high. But, the Government offered no evidence to support the argument. What should the fee have been? There was no evidence

7

Jesse received any payment for his assistance.

There is no evidence that Derle and Jesse Marchus agreed to take or took any action for any purpose other than helping Ms. Heid get her son out of jail. The court is not willing to find that the act of posting bail is by definition a criminal act.

The Rule 29 motions taken under advisement at the conclusion of trial are granted and the indictment charging money laundering conspiracy is hereby dismissed.

Dated this 9th day of April, 2010.

                                            /s/ *Patrick A. Conmy*
                                            Patrick A. Conmy, Senior District Judge
                                            United States District Court